USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _4/26/19_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -X

SECURITIES AND EXCHANGE COMMISSION,

               Plaintiff,

     - against -

SEETHRUEQUITY, LLC, AJAY TANDON,
and AMIT TANDON,

               Defendants.

- - - - - - - - - - - - - - - - - - -X

18 Civ. 10374 (LLS)

OPINION & ORDER

In this action, the Securities and Exchange Commission ("SEC") claims that the defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Section 17(a) and (b) of the Securities Act of 1933 ("Securities Act"). The SEC's complaint (Dkt. No. 4) alleges that the defendants defrauded the investing public over a five-year course of business regarding defendant SeeThruEquity, LLC's equity research, and that they profited from that deception.

The defendants move to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). For the following reasons, the motion (Dkt. No. 15) is denied.

-1-

## BACKGROUND[1]

The defendants are SeeThruEquity, LLC ("STE") and its operators, brothers Ajay Tandon and Amit Tandon.  STE is a stock research company that publishes research reports of small and microcap issuers.  STE also hosts investor conferences.  Ajay Tandon is the STE's co-founder and CEO, and Amit Tandon is STE's co-founder and Director of Research.

Ajay Tandon and Amit Tandon co-founded STE in 2011 as an equity research company focused on smaller emerging growth companies.  STE creates research reports on approximately 240 companies, which it publishes on its website, distributes to investors via email, makes available on its social media platforms, and announces through press releases.  Ajay Tandon and Amit Tandon divide the responsibilities of STE's research business roughly evenly.

The defendants prepare research reports as follows: Ajay Tandon or Amit Tandon assign an analyst, retained as a STE contractor at a rate of $1,000 per report, to prepare the report. The analyst inserts relevant financial data into STE's quantitative model which produces, among other things, an

---

[1] The factual background is derived from the allegations in the complaint, which the Court must accept as true in considering defendants' motion to dismiss. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

objective "price target."  The analyst forwards a draft of the research report to Ajay Tandon or Amit Tandon, who finalizes and publishes it.  The research report lists STE's price target alongside a recent historical price of the stock.

All of the STE research reports between November 9, 2013, through at least March 30, 2018, contained a representation such as, "SeeThruEquity has not been compensated for the preparation of this report by any third party or the company covered in the report."  Compl. ¶ 36.  STE also represented on its website that its research was "unbiased" and "not paid for."  Compl. ¶ 37.  Despite those representations, the defendants allegedly received compensation from STE's covered companies for publishing favorable research reports.

The compensation that the defendants received from the covered companies was purportedly for conference presentation fees.  They invited covered companies to make presentations at STE investor conferences at a cost of $4,000 to $7,000 in exchange for STE providing a free research report for that company.  Approximately 233 out of the 241 companies covered by STE's research paid STE purported conference presentation fees, and four other companies paid STE for distribution or press release services.  Beginning in or about August 2016, STE began disclosing in its research reports:

-3-

> In some but not in all instances, SeeThruEquity and/or its officers, directors or affiliates may receive compensation from companies featured in its reports for non report-related services which may include charges for presenting at SeeThruEquity investor conferences, distributing press releases and performing certain other ancillary services. The company featured in this report paid SeeThruEquity its standard fee described below for distributing a press release on this report…[identifying standard fees].

Def. Reply Br. (Dkt. No. 17) at 2-3; see Compl. ¶ 51.

The defendants allegedly schemed to conceal that Ajay Tandon received stock as compensation from a covered company, Quadrant 4 Systems Corp. ("QFOR"). Ajay Tandon held primary responsibility for the QFOR initial and update reports. Approximately one month before STE published the initial report in December 2012, QFOR issued a stock certificate for 10,000 shares of its restricted stock to Bajinder Bither, the uncle of Ajay Tandon and Amit Tandon. Bither purportedly performed consulting work for QFOR. Although Bither lived in India, Ajay Tandon directed QFOR to mail the stock certificate to STE's Manhattan office. In December 2012, STE published its initial report on QFOR, which listed STE's price target as $0.59, more than four times QFOR's then-current trading price of $0.14. The initial report (and a subsequent update report) claimed that neither STE nor its principals owned shares of QFOR. On December 4, 2013, Ajay Tandon wrote a letter to the QFOR transfer agent requesting the removal

-4-

of the restrictions on the 10,000 shares and the reissue of the shares in his name.  Five days later, an unrestricted share certificate was issued in Ajay Tandon's name and STE published the update report.

The complaint alleges that the defendants inflated the price targets in the STE research reports above the price target that STE's quantitative model produced in exchange for compensation.

The QFOR update report on December 9, 2013, is one example. At that time, QFOR stock was trading at $1.14.  The STE analyst assigned to draft the report put the relevant data into the model, which produced a price target of $1.78.  The analyst sent Ajay Tandon a draft report showing $1.78 as the target price.  Ajay Tandon sent a series of emails to the analyst that day, directing the analyst to "push it north of $2" (to $2.26) "because it is a stock 'hurdle' if you get my meaning," although the analyst warned that "this one is a real stretch."  He then directed the analyst to raise the price target to $3.16 after QFOR's CEO expressed displeasure with the $2.26 price target; finally he directed the analyst to raise it further, and the analyst raised the price target to $5.25.

The defendants also allegedly represented that STE followed "customary internal trading restrictions" while simultaneously trading in the stocks they were promoting.  Beginning in or about

August 2016, STE added language to its research reports that STE "follows customary internal trading restrictions pending the release of its reports." Compl. ¶ 114. The complaint alleges that, in fact, STE had no trading restrictions and that Ajay Tandon "scalped" securities in violation of the law and customary internal trading restrictions. Between 2014 and the present, Ajay Tandon allegedly generated $20,000 in profits by engaging in multiple instances of "scalping": recommending that investors purchase a security while secretly selling that same security. On at least ten occasions, including one in October 2016, Ajay Tandon bought STE-covered stock shortly before STE published a favorable research report on the issuer, and then sold that stock at a higher price shortly after STE published its report.

### Claims

The SEC asserts seven claims against the defendants for violations of the anti-fraud provisions of the federal securities laws:

    I.   Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder (STE and Ajay Tandon)

    II.   Violations of Section 17(a)(1) of the Securities Act (STE and Ajay Tandon)

    III.   Violations of Section 17(a)(3) of the Securities Act (STE and Ajay Tandon)

    IV.   Violations of Section 17(a)(2) of the Securities Act (Ajay Tandon)

V.    Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder (Ajay Tandon and Amit Tandon)

VI.   Failure to Disclose Compensation in Violation of Section 17(b) of the Securities Act (All Defendants)

VII.  Aiding and Abetting Violations of Section 17(b) of the Securities Act (Ajay Tandon)

**DISCUSSION**

### *Shotgun Pleading*

The defendants contend that the complaint is a "shotgun pleading" that does not satisfy the heighted pleading requirement in Federal Rule of Civil Procedure 9(b).  They argue that the complaint does not provide them with enough information to prepare an adequate answer because its counts merely incorporate by reference the previous 131 paragraphs of factual allegations and recite the generic elements of the statute or rule at issue; do not highlight a specific subset of facts; and do not clearly differentiate between the conduct of the defendants.  Other courts have disapproved of the SEC's use of "shotgun" pleadings which leave "Defendants and the Court with the task of combing the Complaint and inferring, rightly or wrongly, what specific conduct the SEC intended to assert as a violation."  SEC v. Fraser, No. CV-09-00443, 2010 WL 5776401, at *9 (D. Ariz. Jan. 28, 2010).

-7-

Here, however, the complaint readily makes clear "which allegations of fact are intended to support which claim(s) for relief." Croons v. New York State Office of Mental Health, 18 F. Supp. 3d 193, 199 (N.D.N.Y. 2014) (citation and internal quotation marks omitted). The complaint describes each defendant's alleged misconduct in several categories:

Misrepresentations and omissions regarding supposedly "unbiased" and "not paid for" research

- STE represented on its website that its research was "unbiased" and "not paid for." Compl. ¶ 37.

- Ajay Tandon and Amit Tandon knew when they issued the reports that the reports contained misrepresentations. Id. ¶ 38.

- Ajay Tandon approved STE's reports for publication. Id. ¶ 39.

- Ajay Tandon directed an analyst to put a company's research report on hold because it had not paid for the conference. Id. ¶ 43.

- STE received at least $500,000 from companies in its coverage universe. Id. ¶ 45.

STE's research reports for QFOR misrepresent compensation and ownership of a covered stock

- Ajay Tandon directed QFOR to mail the stock certificate (issued to his uncle) to STE's Manhattan office. Id. ¶ 57.

- Ajay Tandon involved his uncle in the scenario in order to hide Ajay Tandon's ownership of the stock. Id. ¶ 69.

Misrepresentations and omissions regarding objectivity of STE price targets

- The defendants used the quantitative STE Model. Id. ¶ 78.

-8-

- Ajay and Amit Tandon instructed STE analysts to increase the price targets generated by the STE model. <u>Id.</u> ¶ 86.

- The STE reports did not disclose that price targets were increased in order to better satisfy the issuers. <u>Id.</u> ¶ 93.

- Ajay Tandon directed the analyst assigned to the QFOR report to "push it [the price target] north of $2." <u>Id.</u> ¶ 100.

<u>Misrepresentations concerning "customary trading restrictions"</u>

- The "Disclosures" section of STE's research reports represented that STE "follows customary internal trading restrictions pending the release of its reports." <u>Id.</u> ¶ 114.

- Ajay Tandon sold a covered stock on the same day that STE published a research report on the issuer that contained that representation. <u>Id.</u> ¶ 118.

<u>Ajay Tandon scalped covered stocks</u>

- Ajay Tandon engaged in multiple instances of scalping. <u>Id.</u> ¶ 120.

\*\*\*

The complaint also clearly identifies the specific defendants to which each count applies. One count applies to all defendants (Count VI), three counts apply to STE and Ajay Tandon (Counts I, II, and III), one count applies to Ajay Tandon and Amit Tandon (Count V), and two counts apply to Ajay Tandon (Counts IV and VII). Given that the counts incorporate by reference the detailed factual allegations in the complaint -- a practice endorsed by Federal Rule of Civil Procedure 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading") --

-9-

the defendants have sufficient notice as to which particular alleged actions gave rise to each count.

### *Plead Materiality with Particularity*

Next, the defendants contend that the SEC fails to plead materiality with particularity.  A misrepresentation or omission of fact must be material for liability to attach under Exchange Act Rule 10b-5(b) or Securities Act § 17(a)(2), and materiality must be pled with particularity. The defendants argue that the complaint contains no factual basis to support its assertions of materiality, because it "is devoid of any facts concerning investor conduct or testimony, any analysis concerning stock price or volume movement, or anything else that would support the allegation that the allegedly false statements or omissions were material."  Def. Br. (Dkt. No. 15) at 5.

The complaint here nonetheless contains ample factual allegations that support materiality.  It alleges in detail that the defendants misled their customers into believing that the research reports were "unbiased," "not paid for," and created using an objective model (Compl. ¶¶ 31, 36-37, 42), although the defendants received compensation for the research reports and inflated the price targets at the

-10-

covered companies' behest (id. ¶¶ 38, 41-45). Misrepresentations regarding compensation received for promoting securities are recognized as material for purposes of the federal securities laws. See, e.g., SEC v. Corporate Rels. Grp., No. 6:99-CV-1222, 2003 WL 25570113, at *7 (M.D. Fla. Mar. 28, 2003) ("a reasonable investor would certainly consider it relevant to the 'total mix' of information that the Veitia Defendants were paid in stock of the companies they promoted in exchange for the promotions"). Although the research reports disclose that STE "may receive compensation from companies featured in its reports for non-report related services," for pleading purposes it may be regarded as plausible that the compensation the defendants received was actually for publishing favorable reports.

### *"Scheme" Liability*

Defendants also argue that the SEC inadequately alleges "scheme" liability under Rule 10b-5(a) and (c) and Section 17(a)(1) and (3) because it fails to allege a deceptive act that is distinct from misstatements.[2]  They claim that the

---

[2] Rule 10b-5(b) and Section 17(a)(2) impose liability for making misstatements and omissions, whereas Rule 10b-5(a) and Section 17(a)(1) impose liability for employing "any device, scheme, or artifice to defraud" and Rule 10b-5(c) and Section 17(a)(3) impose liability for engaging in any act which operates as a fraud or deceit "in connection with the purchase or sale of any security" and "in the offer or sale of any securities," respectively.

complaint alleges only misrepresentations and omissions, and not any distinctive deceptive acts. They cite SEC v. Kelly for the proposition that scheme liability under those subsections "hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011). The Kelly Court dismissed the SEC's scheme liability claims because the defendant's deceptive act (selling advertising to a transactional counterparty -- a practice that the SEC conceded was typical in business) was deceptive only because of subsequent public misrepresentations about it. Id. at 344. It explained that "courts have routinely rejected the SEC's attempt to bypass the elements necessary to impose 'misstatement' liability under subsection (b) by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'" Id. at 343.

The Supreme Court's recent ruling in SEC v. Lorenzo forecloses defendants' scheme liability argument in this case. 139 S. Ct. 1094 (2019). The Court's holding in Lorenzo is clear: "Those who disseminate false statements with intent to defraud are primarily liable under Rules 10b-5(a) and (c), § 10(b), and § 17(a)(1), even if they are secondarily liable under Rule 10b-5(b)." Id. at 1104. Here, the complaint alleges that defendants repeatedly made false or misleading statements in their research reports, press releases, and website. It cites several

examples of such statements: that defendants "had not been compensated" for preparing the research reports, and that the research reports were "unbiased," (Compl. ¶¶ 1, 36-37); that defendants observed "customary internal trading restrictions" (id. ¶¶ 114-18); and that the stock price targets in the research reports were the product of objective research (id. ¶¶ 1, 28, 31). The complaint alleges that the defendants' entire business model, beyond any misstatements or omissions, is deceptive. Thus, the SEC adequately alleges the "scheme liability" claims under Rule 10b-5(a) and (c) and Section 17(a) and (c).

### Transfer of Funds

Finally, the defendants argue that the SEC's claim against Ajay Tandon violating Section 17(a)(2) fails because it has pled that the fund were transferred from a covered company, not an investor. They rely on the SEC's statement in In the Matter of Flannery that Section 17(a)(2) requires a "transfer of money or property from an investor to the defendant." SEC Release No. 3981, 2014 WL 7145625, at *5 (SEC Dec. 15, 2015), vacated on other grounds, 810 F.3d 1 (1st Cir. 2015). The defendants contend that, because the SEC alleges Ajay Tandon received compensation from covered companies (not from investors), that compensation does not satisfy the causation requirement in Section 17(a)(2).

-13-

However, Section 17(a)(2) imposes no requirement that the transferred funds come directly from investors.  Instead, it provides that it shall by unlawful for any person, directly or indirectly, "to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77q(a)(2).  It does not specify the source from which the money or property must be transferred.  The complaint alleges that Ajay Tandon traded in stocks that STE promoted, that he received QFOR stock in exchange for issuing a misleading research report on QFOR, and that he received a salary from STE that was partially funded by STE's misleading research reports.  It therefore states a claim for a Section 17(a)(2) violation.

## CONCLUSION

Defendants' motion to dismiss the complaint (Dkt. No. 15) is denied.

So ordered.

Dated: New York, New York
       April 26, 2019

_____
LOUIS L. STANTON
U.S.D.J.

-14-